# 07 CA 10704 MLW

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PHILADELPHIA FEDERATION OF TEACHERS :
HEALTH AND WELFARE FUND, on behalf of :
itself and all others similarly situated,

                              :         **Civil Action No.**

               Plaintiff,      :

    v.                               :

BRAINTREE LABORATORIES, INC.,     :      **JURY TRIAL DEMANDED**

             Defendant.     :      MAGISTRATE JUDGE

## CLASS ACTION COMPLAINT

Plaintiff, Philadelphia Federation of Teachers Health and Welfare Fund, on behalf of

itself and the class defined below, brings this action against Defendant Braintree Laboratories,

Inc. ("Braintree" or "Defendant") and alleges as follows based upon personal knowledge as to

matters relating to itself and upon the investigation of its counsel and information and belief as to

all other matters:

## NATURE OF THE CASE

1.      This case arises from Braintree's anti-competitive scheme to block entry of

generic competition in order to maintain its monopoly power in the United States over the brand

named drug MiraLax and any actual or potential A-rated generic competitors. Braintree's

scheme was intended to, and succeeded in, allowing it to charge supracompetitive prices for

MiraLax, causing Plaintiff and members of the class to pay overcharges on their purchases.

2.      MiraLax is an osmotic laxative, manufactured and marketed by Braintree, that

causes water to be retained in the stool. The active ingredient of MiraLax is polyethylene glycol

3350. MiraLax was approved by the United States Food & Drug Administration ("FDA") in

- 1 -

February 1999 for the treatment of occasional constipation.

3.       As alleged in greater detail herein, Braintree engaged in a scheme involving U.S.
Patent No. 5,710,183 (the "'183 patent") issued by the United States Patent and Trademark
Office ("PTO"). This misconduct involved, *inter alia*, the improper listing of the '183 patent
with the FDA, and improperly asserting infringement claims based on the '183 patent.

4.       Braintree acted improperly to procure the listing of the '183 patent with the FDA
in order to position itself to enforce the patent by filing patent infringement claims against any
potential competitor seeking FDA approval to manufacture and sell a competing, generic version
of MiraLax. Braintree knew that the mere filing of such patent infringement claims would block
the market entry of potential competitors, irrespective of the merits of the claims.

5.       Braintree then instituted a baseless lawsuit against a potential competitor for the
purpose of forestalling generic competition. In May 2003, Braintree filed a patent infringement
lawsuit against Schwarz Pharma Manufacturing, Inc. ("SPMI"), a company seeking FDA
approval to market a generic version of MiraLax, even though Braintree knew that the '183
patent was improperly procured and that no reasonable claim of infringement could be based
upon it.

6.       Braintree filed this lawsuit not for any legitimate purpose, but because it knew
that the mere filing of such litigation would raise barriers to the entry of generic competition,
including automatically delaying the FDA's granting of final marketing approval to SPMI's
generic version of MiraLax. Without such approval, generic manufacturers cannot bring their
products to market.

7.       By its unlawful acts, Braintree has willfully and unlawfully maintained its

- 2 -

monopoly power over MiraLax and generic and bioequivalent forms of the drug.

8. Braintree's anticompetitive scheme was successful for a time in protecting its MiraLax revenues from generic competition.

9. Plaintiff and the Class it seeks to represent are end-payors of MiraLax; that is, indirect purchasers who paid for MiraLax and any generic version for use, and not for resale. Through its illegal conduct, Braintree unlawfully deprived Plaintiff and other end-payors of access to substantially lower-priced generic versions of MiraLax. Braintree has caused Plaintiff and the class to overpay for polyethylene glycol 3350 by many millions of dollars.

10. In Count I of this Complaint, Plaintiff, on behalf of itself and all others who are end-payors of MiraLax, seek equitable, injunctive and declaratory relief against Defendant pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 based on allegations of monopolization of, and an attempt to monopolize, the market for MiraLax and its generic bioequivalents, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

11. Counts II and III are brought by Plaintiff on behalf of itself and those Class members who purchased or paid for MiraLax and its generic equivalents in Arizona, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Louisiana, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (the "Indirect Purchaser States"). Counts II and III are brought pursuant to the antitrust and unfair and deceptive trade practices acts of the Indirect Purchaser States.

12. Count IV is brought by Plaintiff on its own behalf and on behalf of the Class, seeking a constructive trust and disgorgement of the unjust enrichment of Defendant.

- 3 -

## JURISDICTION AND VENUE

13.     This action is brought under Section 16 of the Clayton Act, 15 U.S.C. § 26, for

injunctive and equitable relief to remedy Defendant's violations of the federal antitrust laws,

particularly Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. The Court has jurisdiction

over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 26. In addition, this

Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(d), as amended in

2005, and 28 U.S.C. § 1367. The amount in controversy exceeds five million dollars

($5,000,000).

14.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. §

1391(b) because Defendant is a Massachusetts corporation, transacts business, is found, and has

agents in this district; and because a substantial portion of the affected trade and commerce

described below has been carried out in this district.

15.     The illegal monopolization and attempt to monopolize the market for MiraLax

and generic versions of MiraLax, as alleged herein, have substantially affected interstate and

foreign commerce.

## PARTIES

16.     Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund

("Teachers' Fund" or "Plaintiff") is located at 1816 Chestnut Street, Philadelphia, Pennsylvania,

and is a voluntary employee benefits plan organized pursuant to Section 501(d) of the Internal

Revenue Code for the purpose of providing health benefits to eligible participants and

beneficiaries. The Teachers' Fund provides health benefits, including prescription drug coverage

benefits, to approximately 20,000 active participants and their spouses and dependents.

- 4 -

17.     Defendant Braintree Laboratories, Inc. is a privately held corporation organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at 60 Columbian Street West, Braintree, Massachusetts 02185-0929.

## INTERSTATE TRADE AND COMMERCE

18.     During all or part of the class period (defined below), Defendant manufactured and sold substantial amounts of MiraLax in a continuous and uninterrupted flow of commerce throughout the United States.

19.     At all material times, MiraLax was manufactured and sold by Defendant and was shipped across state lines and sold to customers located outside its state of manufacture.

20.     During all or part of the class period, Defendant transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the sale of MiraLax.

21.     In furtherance of its efforts to willfully obtain and/or maintain monopoly power over MiraLax and its generic equivalents, Defendant employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.

22.     Defendant's efforts to willfully obtain and/or maintain monopoly power over MiraLax and its generic equivalents, as alleged herein, has substantially affected interstate and foreign commerce.

## FACTUAL ALLEGATIONS

### A.     Brand-Name Drugs vs. Generic Drugs

23.     The prescription drug industry, including the manufacture, marketing, distribution and sale of prescription drugs, is one of the most profitable industries in the United States.  The

- 5 -

U.S. market accounts for more than 40% of the world's prescription pharmaceutical revenues. The cost of prescription drugs in the United States has been rising at a rate of 14% to 18% per year, and the cost of drugs dispensed in the United States for the year 2006 was in excess of $275 billion.

24.     The availability of generic drugs has been one of the most effective means of lowering the cost of prescription drugs. Generic drugs, which also must be approved by the FDA, have the same active chemical composition and provide the same therapeutic effects as the pioneer brand-name drugs upon which they are modeled. The FDA will assign an "A" rating to generic drugs that are therapeutically equivalent to pioneer or brand-name drugs.

25.     To be deemed a therapeutic equivalent and assigned an "A" rating by the FDA, the generic drug must contain the same active ingredient(s); dosage form and route of administration; and strength. If so, the generic drug, as a therapeutic equivalent, can be substituted (and in some instances must be substituted) for the pioneer or brand-name drug at the pharmacy dispensing the drug.

26.     Generic drugs are normally priced substantially below the brand-name drugs to which they are bioequivalent. A 1998 study conducted by the Congressional Budget Office (the "CBO") concluded that generic drugs save consumers and third-party payors between $8 billion and $10 billion a year. A report prepared by the Government Accounting Office in August 2000 observed, "Because generic drugs are not patented and can be copied by different manufacturers, they often face intense competition, which usually results in much lower prices than brand-name drugs."

27.     The Federal Trade Commission ("FTC") estimates that the first generic

- 6 -

manufacturer to enter the market typically charges between 70% and 80% of the price of the brand-name drug. As additional manufacturers bring generic versions of the drug to market, the price continues to drop.

28.     A brand-name drug loses a significant portion of its market share to generic competitors soon after the introduction of generic competition, even if the brand-name manufacturer lowers prices to meet competition. The 1998 CBO study estimates that generic drugs capture at least 44% of the brand-name drug's market share in just the first year of sale.

**B.     The Federal Scheme For Approval Of Pioneer Drugs**

29.     Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "Act"), a company is required to have FDA approval before it may begin selling a new drug. Pre-market approval for a new drug, often referred to as a "pioneer" or "brand-name" drug, must be sought by filing a New Drug Application ("NDA") with the FDA, demonstrating that the drug is safe and effective for its intended use. New drugs that are approved for sale in the United States by the FDA are typically (but not necessarily) covered by patents that provide the patent holder with the exclusive right to sell the new or pioneer drug in the United States for the duration of the patents involved, plus any extension of the original patent period (the "FDA Exclusivity Period") granted pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585, 21 U.S.C. § 355 ("Hatch-Waxman Act").

30.     In addition to information on safety and efficacy, NDA applicants must submit to the FDA a list of all "prior art," as well as patents that claim the drug for which FDA approval is being sought or that claim a method of using the drug and with respect to which a claim of patent infringement could reasonably be asserted. "Prior art" is the term used in patent law to refer to

that body of previous knowledge and technology against which a patent application is judged to determine whether the claim is sufficiently novel to merit patent protection. When the NDA is approved, the FDA "shall publish" the patent information submitted by the NDA applicant. 21 U.S.C. § 355(b)(1).

31.    Once the NDA is approved, the FDA lists any patents referenced as part of the NDA application process in a publication known as the *Approved Drug Products With Therapeutic Equivalence Evaluations.* This publication is commonly called the "Orange Book." In listing patents in the Orange Book, the FDA merely performs a ministerial act. The FDA does not check the facts supplied to it by the brand name manufacturer, but trusts that the manufacturer will be truthful.

32.    Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States only under the direction and care of a physician who writes a prescription, specifying the drug by name, which must be dispensed by a licensed pharmacist. The pharmacist must, in turn, fill the prescription with the drug brand specified by the physician, unless an A-rated generic version of that pioneer drug which has been approved by the FDA is available.

C.    **Prescriptions for Generic Drugs**

33.    Generic drugs are drugs that the FDA has found to have the same active chemical composition and provide the same therapeutic effects as the pioneer, brand-name drugs. Where a generic drug is completely equivalent to a pioneer or brand-name drug, the FDA assigns the generic drug an "A" or "AB" rating.

34.    If a generic version of a brand-name drug exists and the physician has not

- 8 -

specifically indicated on the prescription "DAW" or "dispense as written" (or similar indications, the wording of which varies slightly from state to state), then: (a) for consumers covered by most insurance plans, the pharmacist will substitute the generic drug; and (b) for consumers whose purchases are not covered by insurance plans, the pharmacist will offer the consumer the choice of purchasing the branded drug, or the A-rated generic at a lower price.

35.     Once a physician writes a prescription for a brand-name drug such as MiraLax, that prescription defines and limits the market to the drug named or its A-rated generic equivalent. Only drugs that have received an A generic rating from the FDA may be substituted by a pharmacist for a physician's prescription for a brand-name drug.

### D.     Abbreviated New Drug Applications For Generic Drugs

36.     Congress enacted the Hatch-Waxman Act in 1984 to establish an abbreviated process to expedite and facilitate the development and approval of generic drugs. Consumers benefit from the choice and competition. To effectuate its purpose, the Hatch-Waxman Act permits a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA"), which incorporates by reference the safety and effectiveness data developed and previously submitted by the manufacturer of the original, pioneer drug. The Hatch-Waxman Act also provides an economic incentive to the first ANDA filer for a particular generic drug: a 180-day statutory period of market exclusivity, during which time the manufacturer has the right to market its drug free from competition from other generic manufacturers.

37.     The ANDA must include information concerning the applicant's position *vis-à-vis* the patent that the pioneer drug manufacturer claims applies to the drug. Therefore, the ANDA filer must make one of four certifications:

- 9 -

I.      that no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification");

II.      that the patent for the pioneer drug has expired (a "Paragraph II Certification");

III.     that the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

IV.    that the patent for the pioneer drug is invalid or will not be infringed upon by the proposed generic company's product (a "Paragraph IV Certification").

21 U.S.C. § 355(j)(2)(A)(vii). In the case of a patent that has not yet expired, the ANDA applicant's only certification options are Paragraph III or IV Certifications.

38.     If the ANDA contains a Paragraph IV Certification, the ANDA applicant must provide notice to the owner of each patent that is referred to in the certification, and to the holder of the approved NDA to which the ANDA refers. *See* 21 U.S.C. § 355(j)(2)(B)(I). The notice must include a detailed statement of the factual and legal basis for the ANDA applicant's assertion that the patent is not valid or will not be infringed by the generic product. *See id.*; 21 C.F.R. § 314.95.

39.     The brand-name drug patent owner, upon receiving a Paragraph IV Certification from an ANDA applicant, has 45 days to initiate a patent infringement suit against the applicant. *See* 21 U.S.C. § 355(j)(5)(5)(iii). If no action is initiated within 45 days, the process for FDA approval of the generic product is not delayed by patent issues. However, if a patent

infringement suit is brought within the 45-day window, FDA approval of the ANDA is automatically postponed until the earliest of the expiration of the patents, the expiration of 30 months from the patent holder's receipt of notice of the Paragraph IV Certification, or a final judicial determination of non-infringement.

40.     Accordingly, brand-name drug patent holders need only to file a patent infringement lawsuit within 45 days of receipt of Paragraph IV Certification in order to automatically block an ANDA applicant's generic drug from entering the market for up to 30 months.

41.     An improper Orange Book listing also has additional anti-competitive effects because the first generic company to file an ANDA with a Paragraph IV Certification is, upon FDA approval, granted a 180-day period of exclusivity in relation to other generic manufacturers. 21 U.S.C. 355(j)(5)(B)(iv). This 180 day exclusivity against other generic competitors is awarded to the first Paragraph IV filer regardless of whether or not the brand company institutes pre-approval patent infringement litigation in response to the Paragraph IV certification. Absent an improper Orange Book listing, no Paragraph IV certification would be required and, thus, no generic company would receive 180-day exclusivity.

42.     Defendant was at all times fully familiar with the ability to delay the entry of generic competition by improperly manipulating the patent listing and pre-approval litigation provisions of the Hatch-Waxman Amendments.

### E.     Defendant's Unlawful Scheme to Quash Generic Competition

#### 1.     The '183 Patent Approval, Acquisition by Braintree, and Listing in the Orange Book

43.     Braintree has asserted that the '183 patent covers MiraLax and bars generic

- 11 -

competition. The '183 patent claims, *inter alia*, a composition for the improvement of bowel function comprising polyethylene glycol and a fiber bulking agent, wherein the polyethylene glycol is present in a weight ratio of polyethylene glycol to fiber of at least about 1:2 and no more than about 7:1.

44.     The patent application was filed on July 14, 1995. George M. Halow of El Paso, Texas was listed as the inventor.

45.     During the prosecution of the '183 patent, the Examiner issued an Office Action dated February 25, 1997, rejecting claims 1-33 in the '183 patent. The Examiner found that the combination of several references - Kais, Powell, Parker/Kimura, and Fordtran - teach polyethylene glycol with a fiber bulking agent.

46.     Claim 34, which ultimately issued as claim 33, is for "a method for improving bowel function in a mammal, comprising orally administering polyethylene glycol to the mammal in an amount sufficient to improve bowel motility, stool formation or both." Claim 34 (issued as claim 33) makes no reference to use of a fiber bulking agent.

47.     The Examiner separately rejected claim 34 as obvious in light of Kimura or Fordtran, as both references teach compositions containing polyethylene glycol to improve bowel movement.

48.     Halow, and/or individuals acting on his behalf, represented to the PTO in a response dated May 27, 1997, that claims 1-34 "provide a unique composition containing polyethylene glycol and a fiber bulking agent wherein PEG is present in a weight ratio of polyethylene glycol to fiber of from about 1 to 2 to no more than about 7 to 1. These percentages are critical and nowhere are they discussed or taught in the base references or the

- 12 -

alleged equivalence teaching set forth by the secondary references."

49.     Additionally, Halow and/or individuals acting on his behalf emphasized in the response the critical nature of the ratio of polyethylene glycol and fiber by explaining that if "the PEG to fiber ratio is too low, rapid onset of activity of the products of the invention drops off and begins to approach the low onset of a fiber based bulk laxative of the prior art. If the PEG to fiber ratio is too high, the volume of composition which must be ingested to obtain the benefits of the fiber content may be too high and the excess PEG may result in undesirable effects, such as those associated with PEG based bowel lavage compositions, such as those set forth in Kimura, et al or Fordtran."

50.     The Examiner issued a Notice of Allowance reasoning that "the claims are considered to distinguish over the prior art since there is no teaching of the ratio for the two active ingredients."

51.     The '183 patent was issued on January 20, 1998.

52.     Crucially, 32 of the 33 claims in the '183 patent were limited by the ratio for the two active ingredients. Claim 33, however, issued unchanged and without this restriction, despite having been rejected by the PTO because it was prior art.

53.     On information and belief, Braintree had previously, in approximately 1985 and 1990, sought to patent polyethylene glycol 3350, but each time the PTO rejected Braintree's patent application because it was based on prior art.

54.     On information and belief, when Braintree filed its NDA for MiraLax, Braintree owned no patents that covered MiraLax.

55.     On information and belief, Braintree learned about the '183 patent while its NDA

- 13 -

for MiraLax was pending.

56.     On information and belief, Braintree's counsel examined the '183 patent issued to Halow and concluded, in a letter dated December 23, 1998, sent to Halow, that claim 33 of the '183 patent was directly anticipated by the prior art, and hence invalid.

57.     On information and belief, Braintree paid Halow a nuisance-value payment of approximately $15,000 for a non-exclusive license of the '183 patent.

58.     On information and belief, Braintree nevertheless listed the '183 patent in the FDA's *Orange Book* in 1999, the same year that Braintree received final marketing approval for its MiraLax NDA and began selling MiraLax.

59.     On information and belief, Braintree did not purchase the '183 patent outright from Halow until late 2001, shortly before MiraLax would lose its marketing exclusivity on February 18, 2002.

### 2.     Braintree's Filing of a Sham Lawsuit

60.     On January 30, 2003, SPMI submitted an ANDA with the FDA for a generic version of Braintree's MiraLax. SPMI called its generic product GlycoLax. SPMI's GlycoLax is comprised of only polyethylene glycol and does not contain a fiber bulking agent.

61.     In accordance with 21 U.S.C. § 355(j)(5)(B), SPMI sent Braintree a Paragraph IV certification letter on April 1, 2003.

62.     On May 16, 2003, Braintree filed suit against SPMI for infringement of claim 33 of the '183 patent in the United States Court for the District of Delaware, thereby invoking the Hatch-Waxman Act's automatic 30-month stay. Braintree sued for patent infringement only as to claim 33.

63.     On September 3, 2003 - more than three months after it filed the action - Braintree finally served a complaint on SPMI.

64.     Braintree knew or should have known that its claims against SPMI were baseless. Specifically, Braintree knew or should have known:

(a)     that the Examiner's objections to the claims issued in the '183 patent were only overcome by representations from Halow and/or persons acting on his behalf that it was the ratio of polyethylene glycol to the fiber bulking agent that was "critical" to the patent application and such ratio was not taught or otherwise rendered obvious by the prior art;

(b)     the claims of the '183 patent, if read to cover pure polyethylene glycol compositions, calls into question the *bona fides* upon which the patent was issued;

(c)     if construed to cover polyethylene glycol alone, claim 33 is invalid in view of prior art;

(d)     if construed to cover polyethylene glycol alone, there were public uses of the patented subject matter outside the one year grace period set forth in 35 U.S.C. § 102(b);

(e)     if construed to cover polyethylene glycol alone, there was no disclosure of polyethylene glycol only compositions, or their preparation or application, in accordance with the requirements of 35 U.S.C. § 112; and

(f)     if construed to cover polyethylene glycol alone, the use of compositions comprising polyethylene glycol to treat constipation was known for twenty years prior to the filing of the Halow application on July 14, 1995.

65.     Alternatively, Braintree knew or should have known that claim 33 cannot be construed to cover the use of polyethylene glycol alone and that SPMI's GlycoLax is comprised

- 15 -

of only polyethylene glycol.  GlycoLax does not contain a fiber bulking agent.

66.　　On December 23, 2003, SPMI received a tentative approval letter from the FDA for its ANDA for GlycoLax.  This approval would have become final but for Braintree's baseless lawsuit claiming that SPMI infringed claim 33 of the '183 patent.  Indeed, as discussed below, Braintree's baseless lawsuit delayed even tentative approval.  Absent such conduct, SPMI's generic version of MiraLax would have been approved and on the market much earlier.

67.　　On May 21, 2004, Braintree wrote to SPMI that it had decided to voluntarily dismiss its patent infringement claim against SPMI with prejudice and without costs.  Braintree also offered SPMI a royalty-free license to claim 33 of the '183 patent.

68.　　On May 24, 2004, Braintree filed "Plaintiff's Motion for Voluntary Dismissal of its Complaint and Motion to Dismiss Defendant's First Counter Claim as Moot."

69.　　On June 3, 2004, the Court dismissed Braintree's complaint with prejudice, ending the remaining portion of the thirty month stay of SPMI's ANDA approval.

70.　　Less than one month later, on July 2, 2004, the FDA gave final approval of SPMI's ANDA for its GlycoLax product.  Within days of the FDA's final approval, GlycoLax was shipped to customers in the United States.

## EFFECTS ON COMPETITION

71.　　Braintree's exclusionary conduct has delayed generic competition to MiraLax and enabled Braintree to sell MiraLax without generic competition.  But for Braintree's misconduct, one or more competitors would have begun marketing A-rated generic versions of MiraLax much sooner than such versions actually were marketed, and Braintree itself would have entered the market with its own generic version of MiraLax.

72.    Braintree's unlawful conduct caused the ANDA approval process to be delayed by the FDA and caused SPMI to divert its resources from its ANDA application and to expend substantial resources on litigation. Absent the patent lawsuit, SPMI and the FDA would have had reason to, and would have, focused and directed their limited resources into the ANDA approval process for generic polyethylene glycol 3350. Such focus and resources would have brought earlier FDA approval and marketing of generic polyethylene glycol 3350. However, Braintree's baseless suit destroyed both SPMI's and the FDA's incentives to expedite review and approval of SPMI's ANDA because it triggered the Hatch-Waxman Act's automatic 30-month stay that would block marketing regardless of approval.

73.    The FDA expeditiously approves ANDAs when the generic product that is the subject of the ANDA is not the subject of a patent infringement lawsuit under the Hatch-Waxman Act. For example, when an ANDA filer makes a Paragraph III Certification, certifying that it will only market the drug at issue upon expiration of a patent listed as applying to the drug in the Orange Book, FDA approval typically occurs on the very same day the patent expires.

74.    In essentially every instance since the year 2000 involving a brand-name drug coming off patent for which an ANDA filer certified that it would market a generic version of the brand-name drug only upon expiration of the relevant patent (*i.e.*, a Paragraph III Certification), the FDA approved the generic applicant the very day (and in a few instances, within one or two days) of the expiration date of the patent. The ANDAs were consistently timely filed and approved regardless of the magnitude of the brand-name drug's annual sales. Moreover, the FDA approved SPMI's ANDA for generic polyethylene glycol 3350 less than one month after Braintree voluntarily dismissed its patent infringement claim against SPMI.

- 17 -

Accordingly, absent Braintree's exclusionary conduct here, the FDA would have promptly and timely approved SPMI's ANDA, permitting generic polyethylene glycol 3350 to enter the market substantially before the actual final approval July 2004, and even before the tentative approval in December 2003.

75.     Braintree's scheme to delay the introduction into the U.S. marketplace of any generic version of MiraLax caused Plaintiff and the Class to pay more than they otherwise would have paid for polyethylene glycol 3350.

**ANTITRUST IMPACT UPON PLAINTIFF AND MEMBERS OF THE CLASS**

76.     During the relevant period, Plaintiff and members of the Class purchased substantial amounts of MiraLax. As a result of Defendant's illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for their polyethylene glycol 3350 purchases. If generic competitors had not been unlawfully prevented from earlier entering the market and competing with Defendant, End-payor purchasers, such as Plaintiff, would have paid less for polyethylene glycol 3350 by (a) substituting purchases of less-expensive, generic polyethylene glycol 3350 for their purchases of more-expensive branded MiraLax; (b) receiving discounts and/or lowering prices on their remaining branded MiraLax purchases; and (c) purchasing generic polyethylene glycol 3350 at lower prices sooner.

77.     As a consequence, Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount of such damages will be calculated after discovery and upon proof of trial.

**MONOPOLY POWER AND RELEVANT MARKET**

78.     Prior to the entry of A-rated generic competition, Braintree had monopoly power

- 18 -

with respect to its MiraLax brand. Braintree had the power to maintain the price of MiraLax at supracompetitive levels profitably, without losing substantial sales.

79.     Prior to generic entry, a small but significant, non-transitory price increase by Braintree to MiraLax would not have caused a significant loss of sales to other products.

80.     Prior to generic entry, Braintree sold MiraLax at prices well in excess of marginal costs and enjoyed high profit margins.

81.     Prior to generic entry, Braintree exercised the power to exclude competition.

82.     To the extent that defining a relevant product market is necessary in this case, the relevant product market is polyethylene glycol 3350 in brand or generic forms.

83.     The relevant geographic market is the United States.

84.     During and prior to the proposed Class Period, Defendant held a 100% share in the relevant product market in the United States.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this action on behalf of itself and as representative of a Class defined as follows:

> All persons or entities in the United States of America and Puerto Rico, who from December 23, 2003 to the present (the "Class Period") indirectly purchased, paid for and/or reimbursed for MiraLax and any generic version thereof for consumption by themselves, their families, or their members, employees, insureds, participants or beneficiaries (the "Class").
>
> Excluded from the Class are Defendant, its subsidiaries and affiliates; all government entities (except for government-funded employee benefit plans); all persons or entities that purchased MiraLax for purposes of resale, or directly from Defendant or its affiliates; and the judge in this case and any members of his/her immediate family.

This class shall be certified as to Plaintiff's claims for violations of the state antitrust and consumer protection laws in the following states: This class shall be certified as to Plaintiff's claims for violations of the state antitrust and consumer protection laws in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Louisiana, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, including all elements of liability and all defenses to such claims; and the state consumer protection laws in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Louisiana, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, and Wisconsin, including all elements of liability and all defenses to such claims.

This class shall also be certified as to Plaintiff's claims for violations of the common law of unjust enrichment in every state and the District of Columbia, including all elements of liability and all defenses to such claims.

86.     Plaintiff seeks class certification pursuant to Rule 23(b)(2) of the Federal Rules of

Civil Procedure as to declaratory and equitable relief sought herein, and Rule 23(b)(3) as to the

damages sought herein.

87.     Although Plaintiff does not know the exact number of class members, it believes

it to be, at a minimum, in the tens of thousands. Thus, members of the Class are numerous and

joinder is impracticable. The Class members are identifiable, *inter alia,* from information and

records that are required by law to be maintained by pharmacies, drugstores, pharmaceutical

benefits managers, and managed care organizations.

88.     Questions of law and fact common to the members of the Class predominate over

questions, if any, that may affect only individual members, in part because Defendant has acted

and refused to act on grounds generally applicable to the entire Class, thereby making

appropriate equitable, injunctive and declaratory relief with respect to the Class as a whole.

Such conduct includes the Defendant's exclusionary and anticompetitive efforts in filing sham

litigation.

89.     Questions of law and fact common to the Class include:

(a)     whether Defendant maintained or attempted to maintain monopoly power
        by delaying generic entry;

(b)     determination of the relevant market (to the extent such a determination is
        necessary);

(c)     whether the '183 patent was improperly issued;

(d)     whether the activities of Defendant as alleged herein have substantially
        affected interstate commerce;

(e)     whether Defendant's litigation asserting infringement of its patent
        described herein was baseless;

(f)     whether Defendant engaged in sham litigation for the purpose of
        preventing competition;

(g)     whether Defendant intentionally and unlawfully excluded competitors and
        potential competitors from the market for MiraLax and generic versions
        thereof;

(h)     whether Plaintiff and members of the Class were injured as a proximate
        result of Defendant's conduct;

(i)     whether the losses suffered by Plaintiff and members of the Class were a
        foreseeable consequence of Defendant's conduct;

(j)     whether Plaintiff and members of the Class are entitled to declaratory,
        equitable and/or injunctive relief; and

(k)     whether Plaintiff and the Class have been damaged and the aggregate
        amount of such damages.

90.     Plaintiff's claims are typical of the members of the Class, in that Plaintiff

purchased and/or paid for MiraLax throughout the United States, including the Indirect

Purchaser States, during the Class Period. Such purchases and payments were made for consumer consumption of MiraLax. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendant.

91.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are not antagonistic to those of the Class. In addition, Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

92.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

93.     Plaintiff knows of no difficulty to be encountered by litigating this action that would preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION

### FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR DEFENDANT'S VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT

94.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

95.    Section 2 of the Sherman Act, 15 U.S.C. § 2, provides in pertinent part that:

> Every person who shall monopolize, or attempt to
> monopolize, or combine or conspire with any other person or
> persons, to monopolize any part of trade or commerce among the
> several States, or with foreign nations, shall be deemed guilty of a
> felony . . . .

96.    Braintree knowingly and willfully engaged in a course of conduct designed to

obtain and extend its monopoly power in the Relevant Market. This conduct included procuring

the `183 patent that Braintree knew to be invalid, improperly listing the `183 patent in the

Orange Book, and improperly filing and prosecuting objectively baseless patent infringement

actions against companies seeking to market competing versions of MiraLax. Braintree's

conduct was designed to delay the introduction of generic formulations of MiraLax into the

market.

97.    Braintree intentionally and wrongfully maintained its monopoly power with

respect to MiraLax in violation of Section 2 of the Sherman Act. As a result of this unlawful

maintenance of monopoly power, Plaintiffs and members of the Class paid artificially inflated

prices for their polyethylene glycol 3350 purchases.

98.    Plaintiff and members of the Class have been injured in their business or property

by Braintree's antitrust violations. Their injury consists of paying higher prices for their

polythelene glycol 3350 purchases than they would have paid in the absence of those violations.

This is the sort of injury that antitrust laws were designed to prevent and flows from Braintree's

unlawful conduct. Plaintiff is the proper entity to bring a case concerning this conduct.

99.    Plaintiff and the Class, pursuant to Rule 57 of the Federal Rules of Civil

Procedure and 18 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendant's

- 23 -

conduct in seeking to prevent competition as described herein violates Section 2 of the Sherman

Act.

    100.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to

Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the

anticompetitive market effects caused by the unlawful conduct of Defendant, and other relief so

as to assure that similar anticompetitive conduct does not occur in the future.

## SECOND CAUSE OF ACTION

### FOR COMPENSATORY AND MULTIPLE DAMAGES UNDER THE ANTITRUST AND/OR CONSUMER PROTECTION STATUTES OF THE INDIRECT PURCHASER STATES

    101.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though

set forth herein.

    102.    Defendant's conduct described herein constitutes unlawful acts of monopolization

and attempts to monopolize, as well as prohibited practices and unconscionable conduct under

the antitrust and/or unfair and deceptive trade practices acts of the Indirect Purchaser States, as

follows:

    a.    Arizona: The aforementioned practices by Defendant were and are in

violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*, the

Arizona Consumer Fraud Act, Ariz. Rev. Stat §§ 44-1521, *et seq.*, and the Constitution of the

State of Arizona, Article 14, §15;

    b.    California: The aforementioned practices by Defendant were and are in

violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and the California

Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

- 24 -

c.      District of Columbia: The aforementioned practices by Defendant were and are in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*;

d.      Florida: The aforementioned practices by Defendant were and are in violation of the Florida Antitrust Act, Fla. Stat. Ann. §§ 542.15, *et seq.*, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

e.      Hawaii: The aforementioned practices by Defendant were and are in violation of Hawaii Revised Statues §§ 480-2, 480-3, and 480-4.

f.      Iowa: The aforementioned practices by Defendant were and are in violation of the Iowa Competition Law, Iowa Code §§ 553.4, 553.5 (1997);

g.      Kansas: The aforementioned practices by Defendant were and are in violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*, and the Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50-623, *et seq.*;

h.      Louisiana: The aforementioned practices by Defendant were and are in violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

i.      Maine: The aforementioned practices by Defendant were and are in violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*;

j.      Michigan: The aforementioned practices by Defendant were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§445.771, *et seq.*, and the Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

k.      Minnesota: The aforementioned practices by Defendant were and are in

- 25 -

violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49, *et seq.,* and the Minnesota Consumer Fraud Act, Minn. Stat §§ 325F.67, *et seq.*;

l.      Mississippi: The aforementioned practices by Defendant were and are in violation of the Mississippi antitrust statute, Miss. Code Ann. §§75-21-1 *et seq.*, in that, *inter alia*, Mississippi consumers are forced to purchase MiraLax from Mississippi pharmacies and vendors at supracompetitive prices;

m.      Nebraska:  The aforementioned practices by Defendant were and are in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*;

n.      Nevada: The aforementioned practices by Defendant were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*, and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.* in that, *inter alia*, Nevada consumers are forced to purchase MiraLax from Nevada pharmacies and vendors at supracompetitive prices;

o.      New Mexico: The aforementioned practices by Defendant were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, and the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

p.      New York: The aforementioned practices by Defendant were and are in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, and the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

q.      North Carolina: The aforementioned practices by Defendant were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §§ 75-1, *et seq.*:

r.    North Dakota: The aforementioned practices by Defendant were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.*, and the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01, *et seq.*;

s.    South Dakota: The aforementioned practices of Defendant were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §§ 37-1-3, *et seq.*, and deceptive trade practices and consumer protection law, S.D. Codified Laws §§ 37-24-1, *et seq.*;

t.    Tennessee: The aforementioned practices of Defendant were and are in violation of the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, and the Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*, in that the conduct complained of had substantial effect on Tennessee commerce in that Tennessee consumers are forced to purchase MiraLax from Tennessee pharmacies and vendors at supracompetitive prices;

u.    Utah: The aforementioned practices of Defendant were and are in violation of the Utah Trade Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.*, the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, *et seq.*, and the Utah Antitrust Act, Utah Code Ann. § 76-10-919;

v.    Vermont: The aforementioned practices of Defendant were and are in violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*;

w.    West Virginia: The aforementioned practices by Defendant were and are in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*; and

x.    Wisconsin: The aforementioned practices by Defendant were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, and the Wisconsin Unfair Trade Practices Act, Wis. Stat. §§ 100.20, *et seq.*, and has substantially affected the people of

- 27 -

Wisconsin and has had substantial impacts within Wisconsin in that Wisconsin consumers are forced to purchase MiraLax from Wisconsin pharmacies and vendors at supracompetitive prices.

103.    As a result of the conduct described above, Plaintiff and the Class have sustained and will continue to sustain substantial losses and damage to their businesses and property in the form of, *inter alia*, being deprived of the ability to purchase less expensive, generic versions of MiraLax, and paying prices for such products that were higher than they would have been but for Defendant's improper actions.  The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

104.    Plaintiff and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, for their injuries caused by these violations pursuant to these statutes.

### THIRD CAUSE OF ACTION

### FOR INJUNCTIVE AND DECLARATORY RELIEF UNDER THE ANTITRUST AND/OR CONSUMER PROTECTION STATUTES OF THE INDIRECT PURCHASER STATES

105.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

106.    Defendant's conduct described herein constitutes unlawful acts of monopolization and attempts to monopolize, as well as prohibited practices and unconscionable conduct under the antitrust and/or unfair and deceptive trade practices acts of the Indirect Purchaser States, as follows:

a.    Arizona: The aforementioned practices by Defendant were and are in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*, the

Arizona Consumer Fraud Act, Ariz. Rev. Stat §§ 44-1521, *et seq.*, and the Constitution of the State of Arizona, Article 14, §15;

        b.      California: The aforementioned practices by Defendant were and are in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and the California Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200. *et seq.*;

        c.      District of Columbia: The aforementioned practices by Defendant were and are in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*;

        d.      Florida: The aforementioned practices by Defendant were and are in violation of the Florida Antitrust Act, Fla. Stat. Ann. §§ 542.15, *et seq.*, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

        e.      Hawaii: The aforementioned practices by Defendant were and are in violation of Hawaii Revised Statues §§ 480-2, 480-3. and 480-4.

        f.      Iowa: The aforementioned practices by Defendant were and are in violation of the Iowa Competition Law, Iowa Code §§ 553.4, 553.5 (1997);

        g.      Kansas: The aforementioned practices by Defendant were and are in violation of the Kansas Monopolies and Unfair Trade Act. Kan. Stat. Ann. §§ 50-101, *et seq.*, and the Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50-623, *et seq.*;

        h.      Louisiana: The aforementioned practices by Defendant were and are in violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

        i.      Maine: The aforementioned practices by Defendant were and are in violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101,

- 29 -

*et seq.*;

j. Michigan: The aforementioned practices by Defendant were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§445.771, *et seq.*, and the Michigan Consumer Protection Act, §§ 445.901. *et seq.*;

k. Minnesota: The aforementioned practices by Defendant were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49, *et seq.*, and the Minnesota Consumer Fraud Act, Minn. Stat §§ 325F.67, *et seq.*;

l. Mississippi: The aforementioned practices by Defendant were and are in violation of the Mississippi antitrust statute, Miss. Code Ann. §§75-21-1 *et seq.*, in that, *inter alia*, Mississippi consumers are forced to purchase MiraLax from Mississippi pharmacies and vendors at supracompetitive prices;

m. Nebraska: The aforementioned practices by Defendant were and are in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*;

n. Nevada: The aforementioned practices by Defendant were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010. *et seq.*, and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.* in that, *inter alia*, Nevada consumers are forced to purchase MiraLax from Nevada pharmacies and vendors at supracompetitive prices;

o. New Mexico: The aforementioned practices by Defendant were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, and the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

p. New York: The aforementioned practices by Defendant were and are in

- 30 -

violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, and the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

      q.     North Carolina: The aforementioned practices by Defendant were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §§ 75-1, *et seq.*;

      r.     North Dakota: The aforementioned practices by Defendant were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.*, and the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01, *et seq.*;

      s.     South Dakota: The aforementioned practices of Defendant were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §§ 37-1-3, *et seq.,* and deceptive trade practices and consumer protection law, S.D. Codified Laws §§ 37-24-1, *et seq.*;

      t.     Tennessee: The aforementioned practices of Defendant were and are in violation of the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, and the Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*, in that the conduct complained of had substantial effect on Tennessee commerce in that Tennessee consumers are forced to purchase MiraLax from Tennessee pharmacies and vendors at supracompetitive prices;

      u.     Utah: The aforementioned practices of Defendant were and are in violation of the Utah Trade Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.*, the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, *et seq.*, and the Utah Antitrust Act, Utah Code Ann. § 76-10-919;

      v.     Vermont: The aforementioned practices of Defendant were and are in violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*;

w.    West Virginia: The aforementioned practices by Defendant were and are in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*; and

x.    Wisconsin: The aforementioned practices by Defendant were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, and the Wisconsin Unfair Trade Practices Act, Wis. Stat. §§ 100.20, *et seq.*, and has substantially affected the people of Wisconsin and has had substantial impacts within Wisconsin in that Wisconsin consumers are forced to purchase MiraLax from Wisconsin pharmacies and vendors at supracompetitive prices.

107.    Plaintiff and the members of the Class have been injured in their business or property by reason of Defendant's antitrust violation alleged in this Count. Their injury consists of being deprived of the ability to purchase less expensive, generic versions of MiraLax, and paying higher prices for MiraLax and generic versions of MiraLax than they would have paid but for Defendant's improper actions. The injury to Plaintiff and the Class is the type of injury antitrust laws were designed to prevent, and the injury flows from Defendant's unlawful conduct.

108.    Plaintiff and the Class, pursuant to laws of the Indirect Purchaser States, hereby seek a declaratory judgment that Defendant's conduct in seeking to prevent competition through the scheme set forth herein is unlawful. Plaintiff and the Class further seek equitable and injunctive relief pursuant to the laws of the Indirect Purchaser States to correct for the anti-competitive market effects and other harms to purchasers caused by the unlawful conduct of Defendant, and other relief so as to assure that similar conduct does not occur in the future.

### FOURTH CAUSE OF ACTION

### FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE TRUST FOR  UNJUST ENRICHMENT BY DEFENDANT

109.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though

set forth herein.

110.    As a result of their unlawful conduct described above, Defendant has been and will continue to be unjustly enriched. Specifically, Defendant has been unjustly enriched, to the detriment of Plaintiff and the Class by the receipt of, at a minimum, unlawfully inflated prices and/or illegal monopoly profits on their sale of MiraLax.

111.    Defendant has benefited from their unlawful acts and it would be inequitable for Defendant to be permitted to retain any of its ill-gotten gains resulting from the overpayments for MiraLax made by Plaintiff and the Class.

112.    Plaintiff and members of the Class are entitled to the amount of Defendant's ill-gotten gains resulting from Defendant's unlawful, unjust and inequitable conduct. Plaintiff and the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the Class members may make claims on a *pro rata* basis.

**WHEREFORE**, Plaintiff prays that:

(a)    the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages; and declare Plaintiff as the representative of the Class;

(b)    the conduct alleged herein be declared, adjudged and decreed to be in violation of Section 2 of the Sherman Act, of the statutes of the Indirect Purchaser States set forth above, and the common law of unjust enrichment;

(c)    Plaintiff and each member of the Class be awarded damages and, where

- 33 -

applicable, treble, multiple, and other damages, according to the laws of the Indirect Purchaser States, including interest;

(d)    Plaintiff and each member of the Class recover the amounts by which Defendant has been unjustly enriched;

(e)    Defendant be enjoined from continuing the illegal activities alleged herein;

(f)    Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law;

(g)    Plaintiff and the Class be granted such other and further as the Court deems just and necessary.

## JURY DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 11, 2007

*TM/ NM/*
_____
Thomas M. Sobol (BBO #471770)
David S. Nalven (BBO #547220)
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA 02142
(617) 482-3700

Jeffrey L. Kodroff
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300

Marc H. Edelson
EDELSON & ASSOCIATES
45 West Court Street
Doylestown, PA 18901
(215) 230-8043

# 07 CA 10704 MLW

## CIVIL COVER SHEET

JS 44 (Rev. 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS

Philadelphia Federation of Teachers Health and Welfare Fund

### DEFENDANTS

Braintree Laboratories, Inc.

**(b)** County of Residence of First Listed Plaintiff  **Philadelphia, PA**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  **Norfolk, MA**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

David S. Nalven, Hagens Berman Sobol Shapiro LLP, 1 Main Street, 4th Floor, Cambridge, MA 02142, (617)482-3700

Attorneys (If Known)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability |  | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | **PRISONER PETITIONS** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 510 Motions to Vacate Sentence |  | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities—Employment | **Habeas Corpus:** |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities—Other | ☐ 530 General |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights | ☐ 535 Death Penalty |  |  |
|  |  | ☐ 540 Mandamus & Other |  |  |
|  |  | ☐ 550 Civil Rights |  |  |
|  |  | ☐ 555 Prison Condition |  |  |

Additional Torts:
- **PERSONAL INJURY**
- ☐ 362 Personal Injury—Med. Malpractice
- ☐ 365 Personal Injury—Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability
- **PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. §26

Brief description of cause:
Unlawful suppression of generic competition by manufacturer of brand name pharmaceutical products

### VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

### VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE  Sue Robinson, Dist. of Delaware
DOCKET NUMBER  03-477-SLR

DATE  04-09-2007

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only **Philadelphia Federation of Teachers Health and Welfare Fund v. Braintree Laboratories, Inc.**

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   **x**    I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

   ___    II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,  *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases

   ___   III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

   ___   IV.  220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

   ___   V.   150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   **Braintree Laboratories, Inc. v. Schwarz Pharma, Inc., 03-cv-00477-SLR (D. Del.)**

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

               YES ☐     NO **X**

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

               YES ☐     NO **X**

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

               YES ☐     NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

               YES ☐     NO **X**

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

               YES ☐     NO **X**

    A.   If yes, in which division do all of the non-governmental parties reside? **N/A**

       Eastern Division ☐     Central Division ☐     Western Division ☐

    B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

       Eastern Division  **X**     Central Division ☐     Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions) **N/A**

               YES ☐     NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME   **David S. Nalven, Hagens Berman Sobol Shapiro LLP**

ADDRESS   **One Main Street, 4th Floor, Cambridge, MA 02142**

TELEPHONE NO.  **(617) 482-3700**

(CategoryForm.wpd -5/2/05)